UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

NEW YORK STATE COURT
OFFICERS ASSOCIATION, on its own
behalf and on behalf of its current and
retired members and their dependents,

           Plaintiff,

      - against -

PATRICIA A. HITE, in her official
capacity as Acting Commissioner of the
New York State Department of Civil
Service; CAROLINE W. AHL and J.
DENNIS HANRAHAN, in their official
capacities as Commissioners of the New
York State Civil Service Commission;
ROBERT L. MEGNA, in his official
capacity as Director of the New York
State Division of the Budget; THOMAS
P. DiNAPOLI, in his official capacity as
Comptroller of the State of New York;
and the HONORABLE JONATHAN
LIPPMAN, in his official capacity as
Chief Judge of the Unified Court System,

           Defendants.

------------------------------------------------------- X

**OPINION AND ORDER**

12 Civ. 470 (SAS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-15-12

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION

       In the summer of 2011, as part of an effort to reduce its budget deficit, New

1

York State's government and the two largest unions representing executive branch employees negotiated changes to their collective bargaining agreements ("CBAs"). The changes included a reduction in the percentage of health insurance premium costs that the State would pay ("contribution rates") and a corresponding increase in the percentage paid by employees. On August 17, 2011, the New York State legislature amended section 167(8) of the New York Civil Service Law for the purpose of implementing those new agreements.[1]

Then, between September and November 2011, the State applied the new, lower contribution rates to judicial employees and their dependents.[2] The health insurance benefits owed to many of these judicial employees were and are governed by the 2007-2011 CBA negotiated through their union, plaintiff New York State Court Officers Association ("the Union").[3] The Union argues that because the new rates were implemented unilaterally through a change in statute and not through renegotiations, and because the new rates contravene the CBA, the

---

[1] *See* Complaint ¶¶ 45-46.

[2] *See id.* ¶¶ 54-80.

[3] *See* Agreement Between the State of New York Unified Court System and The New York State Court Officers Association 2007-2011, Ex. 3 to Declaration of Andrew H. Meier, Assistant Attorney General, in Support of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction ("Def. Mem.").

amendment to the Civil Service Law constitutes a substantial impairment of contract that violates Article I, Section 10 of the United States Constitution.[4] The Union seeks a preliminary injunction prohibiting defendants from continuing to implement the law against its current and retired members and their dependents.

For the reasons explained below, I find that the Union is not likely to succeed on the merits of its Contracts Clause claim. As a result, the motion for a preliminary injunction is denied.

## II. BACKGROUND

Article 8.1 of the CBA governs the provision of health insurance to represented judicial employees. It says that:

> The State shall continue to provide health and prescription drug benefits administered by the Department of Civil Service. Employees enrolled in such plans shall receive health and prescription drug benefits to the same extent, at the same contribution level, in the same form and with the same co-payment structure that applies to the majority of represented Executive Branch employees.[5]

The agreement thus provided Union members with two guarantees: *First*, they would continue to receive health and prescription drug benefits; *Second*, they would receive the same benefits on the same terms as the majority of

---

[4]  *See* Complaint ¶¶ 81-99.

[5]  CBA Article 8.1.

3

represented Executive Branch employees. The prior four agreements between the Union and the State contained substantially similar language, although from 1991 through 2003, the agreements provided for a specific co-payment structure that would apply regardless of the co-payment structure that applied to the majority of represented Executive Branch employees.[6]

Since 1983, section 167(1) of the New York Civil Service Law has established the rates at which the State shall contribute to the medical insurance premiums of its current and retired employees and their dependents. Between 1983 and 2011, section 167(8) permitted the state to treat the rates in section 167(1) as a floor and to pay a higher portion of the premiums if a CBA so required:

> Notwithstanding any inconsistent provision of law, where and to the extent that an agreement between the state and an employee organization entered into . . . so provides, the state cost of premium or subscription charges for eligible employees covered by such agreement may be *increased* pursuant to the terms of such agreement.[7]

This was the state of the law when the Union and State signed the current CBA in 2008. On August 17, 2011, after the State and its largest executive

---

[6] Relevant excerpts from the agreements governing the periods 1991-1995, 1995-1999, 1999-2003, and 2003-2007 are provided in Exhibit 2 to Declaration of James E. Tyrrell, Jr. ("Tyrrell Decl."), plaintiff's counsel, in Support of New York State Court Officers Association's Motion for Preliminary Injunction.

[7] N.Y. Civ. Serv. L. § 167(8) (emphasis added).

branch employee unions agreed to reduce the State's contribution rates below those established by section 167(1), the legislature passed Chapter 491 of the New York Laws of 2011, replacing the word "increased" in section 167(8) with the word "modified." This change permitted the State to pay contribution rates lower than those described in section 167(1), in accordance with the new agreements.

On November 3, 2011, the State announced that it would pay a reduced contribution rate to members of the Union as well.[8] In accordance with the terms of Article 8.1 of the CBA, the rates would be those agreed to by the State and the major executive branch unions.[9]

### III. APPLICABLE LAW

#### A. Contracts Clause

Article I, Section 10 of the Constitution prohibits the states from passing any law "impairing the Obligation of Contracts."

> To determine if a law trenches impermissibly on contract rights, we pose three questions to be answered in succession: (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable

---

[8] *See* 11/3/11 Letter, Ex. 10 to Tyrrell Decl.

[9] *See* 9/29/11 Memorandum, Ex. 9 to Tyrrell Decl.

and necessary.[10]

"Although facially absolute, the Contracts Clause's prohibition 'is not the Draconian provision that its words might seem to imply,'" and "[i]t does not trump the police power of a state to protect the general welfare of its citizens."[11]  "The primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted."[12] "[I]mpairments that go to the heart of the contract, that affect terms upon which the parties have reasonably relied, or that significantly alter the duties of the parties under the contract are substantial."[13]  When the State itself is a party to a contract, courts give less deference "as to whether a particular law was reasonable and necessary."[14]

### B.    Preliminary Injunctions

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a

---

[10]    *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) ("*Buffalo Teachers*").

[11]    *Id.* at 367 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978)).

[12]    *Sanitation & Recycling Indus. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997).

[13]    *Donohue v. Paterson*, 715 F. Supp. 2d 306, 318 (N.D.N.Y 2010).

[14]    *Buffalo Teachers*, 464 F.3d at 369.

likelihood of success on the merits rather than actual success."[15]

As the Supreme Court has recently explained,

> a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[16]

According to the undisputed testimony taken at a preliminary injunction hearing on March 9, 2012, the State is currently paying reduced contribution rates as described in its letters of September 29 and November 3, 2011.[17] The Union's motion seeks to enjoin "[d]efendants' ongoing unilateral reductions and modifications to the State Contribution Rate."[18] Therefore, because "the injunction sought will alter, rather than maintain, the status quo – *i.e.*, is properly characterized as a 'mandatory' rather

---

[15]   *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 (1987).

[16]   *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Although *eBay* addressed the requirements for an injunction in a copyright case, the Second Circuit has said that "we see no reason that *eBay* would not apply with equal force to an injunction in any type of case." *Salinger v. Colting*, 607 F.3d 68, 78 n.7 (2d Cir. 2010).

[17]   *See* 3/9/12 Preliminary Injunction Hearing Transcript ("Transcript") at 105-06.

[18]   Notice of Motion at 2.

7

than 'prohibitory' injunction" the Union "must make a 'clear' or 'substantial' showing of a likelihood of success."[19]

## IV.  DISCUSSION

### A.   Chapter 491 Did Not Violate the Terms of the CBA

The Union argues that the amendment to Civil Service Law section 167(8)

> enable[d the State] to unilaterally impose, upon [the Union] and its Eligible Employees, lower Contribution Rates that were negotiated with a completely different union.  This change eviscerates [the State's] obligation – under Article 8.1 of the CBA and the parties' past practice – to pay at least the minimum Contribution Rate required by Civil Service Law § 167(1).[20]

Plaintiff's argument is refuted by the plain meaning of the words in Article 8.1 of the contract: "Employees . . . shall receive health and prescription drug benefits . . . at the same contribution level . . . that applies to the majority of represented Executive Branch employees."  The contract does not guarantee that Union members will receive health benefits at the rates set by Civil Service Law § 167(1). It guarantees that they will receive benefits at the same rates as the majority of executive branch employees.

---

[19]   *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (quotation and citation omitted).

[20]   Memorandum of Law in Support of Plaintiff New York State Court Officers Association's Motion for Preliminary Injunction ("Pl. Mem.") at 14.

8

The CBA constituted the parties' final agreement.[21]  Under New York law, "[w]here the language of a contract is unambiguous, its interpretation is a matter of law and effect must be given to the intent of the parties as reflected by the express language of the agreement."[22]  "It is a court's task to enforce a clear and complete written agreement according to the plain meaning of its terms, without looking to extrinsic evidence to create ambiguities not present on the face of the document" and a "mere assertion by a party that contract language means something other than what is clear when read in conjunction with the whole contract is not enough to create an ambiguity . . . ."[23]  According to the unambiguous terms of their contract, the Union's members bargained for the same health insurance benefits as the majority of executive branch employees.

Even if it were appropriate to examine the parties' past practices over the history of the contract, those practices would not place this plain meaning in doubt: although it may be true that the Union members' contribution rates had not

---

[21]     "This Agreement is the entire Agreement between the State and the Union, terminates all prior agreements and understandings and concludes all collective negotiations during its term."  CBA Article 33.

[22]     *1550 Fifth Ave. Bay Shore, LLC v. 1550 Fifth Ave., LLC*, 748 N.Y.S.2d 601, 603 (2d Dep't 2002).

[23]     *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 809 N.Y.S.2d 70, 73 (1st Dep't 2006).

changed for twenty-eight years, that simply reflects the fact that the contribution rates of the majority of executive branch employees had not changed during that time period either.[24]

The cases relied on by the Union do not support its position. For example, in *Association of Surrogates & Supreme Court Reporters v. New York* ("*Surrogates*"), the plaintiffs' contracts guaranteed that "[b]i-weekly salaries will be computed on the basis of 10 working days."[25] While the contracts were in effect, the New York Legislature imposed a "lag payroll" on the covered employees that had "the effect of withholding ten percent of each employee's expected wages over a period of twenty weeks and postponing their payment indefinitely."[26] The law constituted a substantial impairment of contract, the court explained, because of "the presence of a specific, separately-enumerated term in each of the collective bargaining agreements which requires that bi-weekly salaries be paid on the basis of ten working days."[27] The legislature's action was

---

[24] *See* Transcript at 21 ("THE COURT: So this situation is happening for the first time? MR. TYRRELL: This is the first time. THE COURT: Where the bigger unions accepted something that you then are asked to follow or told to follow? MR. TYRRELL: Correct.").

[25] 940 F.2d 766, 770 (2d Cir. 1991).

[26] *Id.* at 772.

[27] *Id.*

10

unconstitutional because the law that it passed mandated that the state violate the clear terms of those contracts and pay less, on a bi-weekly basis, than was owed on the basis of ten working days.

The Union also cites *Buffalo Teachers*, where the Second Circuit held that a wage freeze authorized by the State substantially impaired the City of Buffalo's contracts with its employees.[28] But in *Buffalo Teachers*, there was no dispute that the contracts explicitly "provide[d] for periodic step increases and/or other types of salary increases, such as longevity payments."[29] There was also no dispute that the New York Legislature passed legislation empowering a Control Board "to order that all increases in salary or wages of employees . . . are suspended"[30] and that the Control Board subsequently implemented that wage freeze. The impairments of clear contractual obligations in *Surrogates* and *Buffalo Teachers* differ materially from the action at issue here.

According to the State's re-negotiated contracts with the executive branch unions, it was obligated to pay a reduced percentage of the premium costs for executive branch employees. According to the plain terms of Article 8.1 of the

---

[28]   *Buffalo Teachers*, 464 F.3d at 362.

[29]   *Buffalo Teachers Fed'n v. Tobe*, 446 F. Supp. 2d 134, 137 (W.D.N.Y. 2005).

[30]   New York Pub. Auth. L. § 3858(2)(c)(i).

CBA, these new rates also applied to judicial employees represented by the Union. However, at the time, the Civil Service Law did not permit the payment of such rates – to either executive or judicial employees – because section 167(1) established higher rates and section 167(8) permitted only upwards departures from those rates. Therefore, in order to comply with the newly-negotiated contracts, the State had two options. It could violate the clear terms of the statute or it could amend the statue. On August 17, 2011, it chose the latter route, amending section 167(8) to permit downward departures (i.e., modifications) from those rates, as long as such changes were made pursuant to collectively-bargained agreements.[31] As defendants correctly note, "[f]ar from a legislative abrogation of contractual rights, the challenged amendment actually represents the primacy of bargained-for contractual rights over legislative mandates."[32] Thus, under the new statute, the Union and its members "receive what they bargained for, the same

---

[31] This action was neither nefarious nor exceptional: according to testimony at the preliminary injunction hearing, statutes governing civil service laws are regularly amended to comply with new collectively bargained agreements. *See* Transcript at 6 (MR. TYRRELL: "And the way this has been done for 30 years is the following: . . . the state then passes a statute after an agreement is reached, but only after an agreement is reached[,] to implement the agreement."). Indeed, the CBA specifically states that "[t]he parties agree to support jointly any legislation or administrative action necessary to implement the provisions of this Agreement." CBA Article 33.

[32] Def. Mem. at 3.

contribution level as the majority of represented executive branch employees."[33]

The Union attempts to fall back on two other arguments regarding the text of the CBA. *First*, it points to Article 16.1:

> Even assuming *arguendo* that Article 8.1 does not explicitly require the State to continue paying the same Contribution Rate, Article 16.1 is clear that 'with respect to matters not covered by this CBA, the State will not seek to diminsh or impair during the term of this Agreement, any benefit or privilege provided by law, rule or regulation for employees without adequate notice to the Union and, when appropriate, without negotiations with the Union . . .[34]

This argument, too, cannot survive a plain reading of the CBA's terms: Article 16.1 covers only "matters not covered by this CBA" – and the health insurance contribution rates are explicitly covered by Article 8.1. *Second*, at oral argument the Union's counsel pointed to Article 33 of the CBA, which says that "[d]uring the term of this Agreement, neither party will unilaterally seek to modify its terms through legislation or any other means." This argument has at least superficial appeal, because it is true that the State unilaterally modified the *consequences* of the CBA through legislation. The bargained-for guarantee, however, was that Union members would receive health insurance at the same percentage rates as executive branch employees, not that those rates would never change. The State would be in violation of Article 33 if, for

---

[33] *Id*. at 1 (emphasis removed).

[34] Pl. Mem. at 15 n.9.

example, it passed a law impairing the first sentence of Article 8.1 by eliminating the "health and prescription drug benefits administered by the Department of Civil Service."[35] It would also be in violation of Article 33 if it impaired the second sentence of Article 8.1 by, for example, passing a law limiting its contribution rate for judicial employees to fifty percent of its contribution rate for executive branch employees. But Chapter 491 did nothing except conform the law to the terms of the contract agreed to by the majority of executive branch employees, which was binding on the Union's members through Article 8.1.

> **B.    Civil Service Law Section 167(1) Did Not Create Contractual Rights**

The Union's only other argument is that section 167(1) itself created contractual rights, and section 167(8)'s downward departure from the rates set in section 167(1) was itself an impairment of the Union's contract. At the time that the CBA was signed, the law laid out specific rates and permitted only increases in those rates. Rewriting the law so as to permit decreases in those rates, the Union argues, constituted an impairment of contract. But defendants correctly note that courts are hesitant to read contractual rights into statutes because to do so would too easily preclude New York State from changing its policies:

> [A]bsent some clear indication that the legislature intends to bind

---

[35]    Article 8.1.

> itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise . . . . Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body.[36]

The New York Court of Appeals has explained that "certain types of legislative acts, including those fixing salaries and compensation . . . are not presumed to create a contract."[37] Defendants point to no case construing section 167(1) as a contract. The language of the statute lays out policy, just like innumerable other laws, and its terms do not "clearly and unequivocally" express an immutable contractual guarantee. Indeed, section 167(8) – both before and after its amendment by Chapter 491 – anticipates that its terms may be altered though negotiation. Reading section 167 as a contract would improperly impair the ability of the Legislature to change its policies regarding its employees' health insurance plans.

## IV.   CONCLUSION

Because the Union has failed to demonstrate a likelihood of success on its claim that Chapter 491 impaired the CBA, I need not determine whether the

---

[36] *National R. Passenger Corp. v. Atchison, Topeka and Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985) (quoting *Dodge v. Board of Educ.*, 302 U.S. 74, 79 (1937)).

[37] *Cook v. Binghamton*, 48 N.Y.2d 323, 330 (1979).

legislation served a legitimate public purpose or was a reasonable and necessary means to accomplish such a purpose. For the same reason, I need not determine whether the Union has met the other three prongs of the preliminary injunction standard. Accordingly, the Union's motion for a preliminary injunction is denied. The Clerk of the Court is ordered to close the motion [Docket No. 2]. A conference is scheduled for March 22, 2012 at 2:30 p.m.

SO ORDERED:

                                                  Shira A. Scheindlin
                                                  U.S.D.J.

Dated:     New York, New York
              March 15, 2012

-**Appearances**-

**For Plaintiff:**

James E. Tyrrell, Jr., Esq.
Jason W. Rockwell, Esq.
Joseph E. Hopkins, Esq.
Patton Boggs LLP
The Legal Center, One Riverfront Plaza
Newark, NJ 07102
(973) 848-5600

**For Defendants:**

Andrew Hodge Meier
Assistant Attorney General
120 Broadway, 24th Floor
New York, NY 10271
(212) 416-8305